# UNITED STATES *v.* CENTENNIAL SAVINGS BANK FSB (RESOLUTION TRUST CORPORATION, RECEIVER)

No. 89–1926.   Argued January 15, 1991—Decided April 17, 1991

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined, in Parts I and III of which WHITE, J., joined, and in Part III of which BLACKMUN, J., joined. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which WHITE, J., joined, *ante*, p. 568.

*Acting Solicitor General Roberts* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Peterson, Deputy Solicitor General Wallace, Clifford M. Sloan, Richard Farber,* and *Bruce R. Ellisen.*

*Michael F. Duhl* argued the cause for respondent. With him on the brief were *Mark L. Perlis, Frederic W. Hickman, Alfred J. T. Byrne, Colleen B. Bombardier,* and *Daniel R. Richards.**

---

*Briefs of *amici curiae* urging affirmance were filed for the Federal National Mortgage Association by *Joseph Angland, Felix B. Laughlin, David C. Garlock, Richard F. Neel, Jr., Caryl S. Bernstein, Carolyn J. A. Swift,* and *Michel A. Dazé;* for Main Line Federal Savings Bank et al. by *Zachary P. Alexander;* and for the United States League of Savings Institutions by *Richard L. Bacon.*

JUSTICE MARSHALL delivered the opinion of the Court.*

In this case, we consider two questions relating to the federal income tax liability of respondent Centennial Savings Bank FSB (Centennial). The first is whether Centennial realized deductible losses when it exchanged its interests in one group of residential mortgage loans for another lender's interests in a different group of residential mortgage loans. The second is whether penalties collected by Centennial for the premature withdrawal of federally insured certificates of deposit (CD's) constituted "income by reason of the discharge . . . of indebtedness" excludable from gross income under 26 U. S. C. § 108(a)(1)(C) (1982 ed.). The Court of Appeals answered both questions affirmatively. We agree with the Court of Appeals that Centennial's mortgage exchange gave rise to an immediately deductible loss, but we reverse the Court of Appeals' determination that Centennial was entitled to exclude from its taxable income the early withdrawal penalties collected from its depositors.

I

Centennial is a mutual savings and loan institution (S & L) formerly regulated by the Federal Home Loan Bank Board (FHLBB).[1] At issue in this case are two sets of transactions involving Centennial in the 1981 tax year.

The first was Centennial's exchange of "90% participation interests" in a set of mortgage loans held by Centennial for "90% participation interests" in a different set of mortgage loans held by the Federal National Mortgage Association (FNMA).[2] Secured by residential properties located pri-

---

*JUSTICE WHITE joins Parts I and III of this opinion, and JUSTICE BLACKMUN joins Part III.

[1] While this case was pending on appeal, the FHLBB found Centennial to be insolvent. Centennial is currently under the receivership of the Resolution Trust Corporation.

[2] By exchanging merely participation interests, each party retained its relationships with the obligors of the exchanged loans. See Cottage Savings Assn. v. Commissioner, ante, at 557–558, n. 3.

marily in northern Texas, Centennial's 420 loans had a face value of approximately $8.5 million and a fair market value of approximately $5.7 million; FNMA's 377 loans, secured by properties located throughout Texas, likewise had a face value of approximately $8.5 million and a fair market value of $5.7 million. Centennial and FNMA structured the exchange so that the respective mortgage packages would be deemed "substantially identical" under the FHLBB's Memorandum R–49, dated June 27, 1980, a regulatory directive aimed at identifying mortgage exchanges that would not generate accounting losses for FHLBB regulatory purposes but that would generate deductible losses for federal tax purposes. See generally *Cottage Savings Assn.* v. *Commissioner, ante,* at 556–557. On its 1981 return, Centennial claimed a deduction for the loss of $2,819,218, the difference between the face value (and cost basis) of the mortgage interests surrendered to FNMA and the market value of the mortgage interests received from FNMA in return.

The second set of transactions was Centennial's collection of early withdrawal penalties from customers who prematurely terminated their CD accounts. Each CD agreement established a fixed-term, fixed-interest account. See App. 27–29. Consistent with federal regulations, each agreement also provided that the depositor would be required to pay a penalty to Centennial should the depositor withdraw the principal before maturity. See 12 CFR § 526.7(a) (1979); 12 CFR § 526.7(a) (1980); 12 CFR § 1204.103 (1981). Thus, in the event of premature withdrawal, the depositor was entitled under the CD agreement to the principal and accrued interest, minus the applicable penalty. See App. 27–29.

Centennial collected $258,019 in early withdrawal penalties in 1981. In its tax return for that year, Centennial treated the penalties as income from the discharge of indebtedness. Pursuant to 26 U. S. C. §§ 108 and 1017 (1982 ed.), Centennial excluded the $258,019 from its income and reduced the basis of its depreciable property by that amount.

On audit, the Internal Revenue Service disallowed the deduction of the losses associated with Centennial's mortgages, and determined that Centennial should have declared as income the early withdrawal penalties collected that year. After paying the resulting deficiencies, Centennial instituted this refund action in the District Court for the Northern District of Texas, which entered judgment for the United States on the mortgage-exchange issue, and for Centennial on the early withdrawal penalty issue. 682 F. Supp. 1389 (1988).

The Court of Appeals for the Fifth Circuit reversed in part and affirmed in part. 887 F. 2d 595 (1989). It reversed the District Court's ruling that Centennial did not realize a deductible loss in the mortgage-exchange transaction. Relying on its reasoning in another decision handed down the same day, see *San Antonio Savings Assn.* v. *Commissioner*, 887 F. 2d 577 (1989), the Court of Appeals concluded that although the respective mortgage packages exchanged by Centennial and FNMA were "substantially identical" under Memorandum R–49, the two sets of mortgages were nonetheless "materially different" for tax purposes because they were secured by different residential properties. See 887 F. 2d, at 600. Consequently, the court held, the exchange of the two sets of mortgages did give rise to a realization event for tax purposes, allowing Centennial immediately to recognize its losses. See *ibid.*

The Court of Appeals affirmed the District Court's conclusion that Centennial was entitled to treat the early withdrawal penalties as income from the discharge of indebtedness under § 108. The court reasoned that "the characterization of income as income from the discharge of indebtedness depends purely on the spread between the amount received by the debtor and the amount paid by him to satisfy his obligation." *Id.*, at 601. Under this test, the early withdrawal penalties constituted income from the discharge of indebtedness, the court concluded, because the penalties reduced the size of Centennial's obligation to its depositors. See *id.*,

at 601–602. The court rejected the United States' characterization of the penalties as merely a "medium of payment" for Centennial's performance of its "separate obligation" to release the deposits prior to maturity. *Id.*, at 604–605.

The United States thereafter petitioned this Court for a writ of certiorari. Because the Court of Appeals' dispositions of both the mortgage-exchange issue and the early withdrawal penalty issue are in conflict with decisions in other Circuits, and because of the importance of both issues for the savings and loan industry, we granted the petition. 498 U. S. 808 (1990).[3]

## II

The question whether Centennial realized tax-deductible losses when it exchanged mortgage interests with FNMA is controlled by our decision in *Cottage Savings Assn.* v. *Commissioner.* In *Cottage Savings*, we recognized that a property exchange gives rise to a realization event for purposes of § 1001(a) of the Internal Revenue Code[4] so long as the ex-

---

[3] The Fifth Circuit's conclusion that an exchange of mortgages that are "substantially identical" under Memorandum R–49 can give rise to realizable tax losses is in conflict with a decision of the Sixth Circuit. See *Cottage Savings Assn.* v. *Commissioner*, 890 F. 2d 848 (1989), rev'd and remanded, *ante*, p. 554. The Fifth Circuit's conclusion that early withdrawal penalties constitute discharge-from-indebtedness income under the pre-1986 version of § 108 is in conflict with a decision of the Seventh Circuit. See *Colonial Savings Assn.* v. *Commissioner*, 854 F. 2d 1001 (1988), cert. denied, 489 U. S. 1090 (1989). In 1986, Congress amended § 108, limiting its application to situations in which the taxpayer is insolvent or in bankruptcy at the time of the discharge of his indebtedness. See Pub. L. 99–514, § 822(a), 100 Stat. 2373; see also Pub. L. 100–647, § 1004(a)(1), 102 Stat. 3385 (1988) (extending § 108 to "qualified· farm indebtedness"). We granted certiorari nonetheless in light of the significant number of pending cases concerning the tax status of early withdrawal penalties collected prior to 1986.

[4] "The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of

changed properties are "materially different." *Ante*, at 560–562. We concluded that the properties are "different" in the sense "material" to the Code so long as they embody legally distinct entitlements. *Ante*, at 564–565.

That test is easily satisfied here. As in *Cottage Savings*, the participation interests exchanged here were in loans made to different obligors and secured by different properties. Thus, the interests embodied distinct entitlements. We therefore affirm the Court of Appeals' conclusion that Centennial was entitled to a refund of the disallowed losses claimed on its mortgages.

## III

We next consider the question whether the early withdrawal penalties collected by Centennial constituted "income by reason of the discharge . . . of indebtedness" excludable from income under 26 U. S. C. § 108(a)(1) (1982 ed.). We conclude that the penalties were not subject to exclusion under § 108 because the depositors who paid these penalties did not "discharge" Centennial from any repayment obligation.

The version of § 108 in effect for the 1981 tax year states:

> "Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if—
>
> . . . . .
>
> "(C) the indebtedness discharged is qualified business indebtedness." 26 U. S. C. § 108(a)(1) (1982 ed.).

"[Q]ualified business indebtedness" includes "indebtedness . . . incurred or assumed . . . by a corporation." 26 U. S. C. § 108(d)(4)(A) (1982 ed.).[5] Income from the discharge of

---

the adjusted basis provided in such section for determining loss over the amount realized." 26 U. S. C. § 1001(a).

[5] It also includes "indebtedness . . . incurred or assumed . . . by an individual in connection with property used in his trade or business." 26 U. S. C. § 108(d)(4)(A) (1982 ed.).

qualified business indebtedness can be excluded from gross income under § 108 only if the taxpayer elects to reduce the basis of his depreciable property by an amount equal to the income excluded. 26 U. S. C. §§ 108(c)(1), 108(d)(4)(B), 1017 (1982 ed.). Thus, the effect of § 108 is not genuinely to exempt such income from taxation, but rather to defer the payment of the tax by reducing the taxpayer's annual depreciation deductions or by increasing the size of taxable gains upon ultimate disposition of the reduced-basis property.

In characterizing early withdrawal penalties as discharge-of-indebtedness income, Centennial, like the Court of Appeals, focuses purely on the "spread" between the debt that Centennial assumed upon the opening of each CD account and the amount that it actually paid each depositor upon the closing of the account. See 887 F. 2d, at 601. When a depositor opens a CD account, Centennial notes, the bank becomes indebted to the depositor for the principal of the deposit plus accrued interest. By virtue of its collection of an early withdrawal penalty, however, the bank satisfies the debt for *less* than that amount should the depositor withdraw the principal before maturity. The end result, in Centennial's view, is no different from what it would have been had the bank and depositor (freed from the restraints of bank regulatory law) formed no agreement on an early withdrawal penalty at the outset but rather negotiated a forgiveness of that amount at the time of withdrawal.

We reject this analysis because it fails to make sense of § 108's use of the term "discharge." As used in § 108, the term "discharge . . . of indebtedness" conveys *forgiveness of*, or *release from*, an obligation to repay.[6] A depositor who

---

[6] "Discharge" can be used to signify various means of extinguishing a legal duty. See generally Black's Law Dictionary 463 (6th ed. 1990). Thus, a debtor might be said to "discharge" his debt by satisfying it. But § 108 uses "income by reason of the discharge . . . of indebtedness" to refer to the change in the debtor's financial condition when the debtor is no longer legally required to satisfy his debt either in part or in full. "Dis-

prematurely closes his account and pays the early withdrawal penalty does not forgive or release any repayment obligation on the part of the financial institution. The CD agreement itself provides that the depositor will be entitled only to the principal and accrued interest, less the applicable penalty, should the depositor prematurely withdraw the principal. Through this formula, the depositor and the bank have determined in advance precisely how much the depositor will be entitled to receive should the depositor close the account on any day up to the maturity date. Thus, the depositor does not "discharge" the bank from an obligation when it accepts an amount equal to the principal and accrued interest minus the penalty, for this is exactly what the bank is obligated to pay under the terms of the CD agreement.

Because § 108 presupposes the "discharge" of an obligation to repay, we disagree with Centennial and the Court of Appeals' conclusion that the "spread" between the debt assumed by Centennial and the amount paid by Centennial upon the closing of the account is sufficient to trigger § 108. The existence of such a spread is sufficient to demonstrate that Centennial enjoyed an accession to income equal in size to the amount of the penalty. But because this income was not the product of the release of any obligation assumed by Centennial at the outset of the bank-depositor relationship, it does not constitute income "by reason of [a] discharge." In sum, to determine whether the debtor has realized "income by reason of the discharge . . . of indebtedness," it is necessary to look at *both* the end result of the transaction *and* the repayment terms agreed to by the parties at the outset of the debtor-creditor relationship.[7]

---

charge" in this sense can occur only if the creditor cancels or forgives a repayment obligation.

[7] Renewing the argument that it unsuccessfully advanced in the Court of Appeals, the United States characterizes the penalties not as income by reason of the discharge of indebtedness, but rather as income for Centennial's performance of a "separate obligation." This argument

This common-sense reading of the statutory language best comports with the purpose underlying §108. The tax-deferral mechanism in §108 is designed to mitigate the effect of treating the discharge of indebtedness as *income*. See 26 U. S. C. §61(a)(12) (1982 ed.) ("gross income . . . includ[es] . . . [i]ncome from discharge of indebtedness"). Borrowed funds are excluded from income in the first instance because the taxpayer's obligation to repay the funds offsets any increase in the taxpayer's assets; if the taxpayer is thereafter released from his obligation to repay, the taxpayer enjoys a net increase in assets equal to the forgiven portion of the debt, and the basis for the original exclusion thus evaporates. See *United States* v. *Kirby Lumber Co.*, 284 U. S. 1, 3 (1931); *Commissioner* v. *Jacobson*, 336 U. S. 28, 38 (1949); see also *Commissioner* v. *Tufts*, 461 U. S. 300, 307, 310–311, n. 11 (1983). But while the cancellation of the obligation to repay increases the taxpayer's assets, it does not necessarily generate cash with which the taxpayer can pay the resulting income tax. Congress established the tax-deferral mechanism

---

draws on authorities recognizing that §108 does not apply when a creditor discharges a debtor's obligation in exchange for services or some other form of nonmonetary consideration. See *Spartan Petroleum Co.* v. *United States*, 437 F. Supp. 733 (SC 1977) (debt discharged in exchange for cancellation of distributorship agreement); *OKC Corp.* v. *Commissioner*, 82 T. C. 638, 649–650 (1984) (debt discharged in exchange for settlement of lawsuit). In that situation, the debt is not forgiven but is in fact satisfied in full through the debtor's performance of a "separate obligation"; discharge of the debt is merely the "medium of payment" for that performance, and must be treated as ordinary income for tax purposes. See S. Rep. No. 96–1035, p. 8, n. 6 (1980) ("Debt discharge that is only a medium for some other form of payment, such as a gift or salary, is treated as that form of payment rather than under the debt discharge rules"). See generally 1 B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts ¶6.4.7, p. 6–66 (2d ed. 1989). Because we conclude that Centennial's reliance on §108 fails for a more fundamental reason—the absence of a "discharge" for purposes of the statute—we need not consider whether the early withdrawal penalties were actually payments for services unrelated to the debtor-creditor relationship.

in § 108 so that the prospect of immediate tax liability would not discourage businesses from taking advantage of opportunities to repurchase or liquidate their debts at less than face value. See H. R. Rep. No. 855, 76th Cong., 1st Sess., 5 (1939); S. Rep. No. 1631, 77th Cong., 2d Sess., 77–78 (1942). See generally Wright, Realization of Income Through Cancellations, Modifications, and Bargain Purchases of Indebtedness: I, 49 Mich. L. Rev. 459, 477, 492 (1951).

This rationale is squarely implicated only when the debtor is seeking forgiveness or cancellation of a pre-existing repayment obligation. A debtor who negotiates in advance the circumstances in which he will liquidate the debt for less than its face value is in a position to anticipate his need for cash with which to pay the resulting income tax and can negotiate the terms of the anticipated liquidation accordingly. Moreover, insofar as the CD agreements at issue in this case committed Centennial to releasing the deposits at the sole election of the depositors, Centennial abandoned any control whatsoever over whether and when these particular debt obligations would be liquidated. Consequently, unlike a debtor considering the negotiation of an adjustment of the terms of his duty to repay, Centennial had no discretion to take the tax effects of the transaction into account before liquidating its debt obligations at less than face value.

It is true, as Centennial points out, that construing § 108 to apply only to debt reductions stemming from a negotiated forgiveness of a duty to repay withholds a tax incentive to include "anticipatory discharge" terms in the credit agreement at the outset. But we read the statutory language as embodying a legislative choice not to extend the benefits of § 108's deferral mechanism that far. For the reasons that we have stated, Congress could easily have concluded that only debtors seeking a release from a pre-existing repayment obligation need or deserve the tax break conferred by § 108. Consistent with the rule that tax-exemption and -deferral provisions are to be construed narrowly, *Commissioner* v.

*Jacobson, supra,* at 49; *Elam* v. *Commissioner,* 477 F. 2d 1333, 1335 (CA6 1973), we conclude that Congress did not intend to extend the benefits of § 108 beyond the setting in which a creditor agrees to release a debtor from an obligation assumed at the outset of the relationship.

## IV

For the foregoing reasons, the judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

For opinion of JUSTICE BLACKMUN, concurring in part and dissenting in part, see *ante,* p. 568.