**PHILIP MORRIS INC., Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 508, Docket 95–4084.**

United States Court of Appeals, Second Circuit.

Argued Nov. 7, 1995.

Decided Dec. 8, 1995.

Jerome B. Libin, Sutherland, Asbill, & Brennan, Washington, DC (William S. Corey, David A. Golden, of counsel), for Petitioner–Appellant.

Charles Bricken, United States Department of Justice, Washington, DC (Assistant Attorney General Loretta C. Argrett, Gary R. Allen, Richard Farber, of counsel), for Respondent–Appellee.

Before: KEARSE, WINTER, and CABRANES, Circuit Judges.

WINTER, Circuit Judge:

Philip Morris Inc. appeals from a Tax Court decision (Theodore Tannenwald, Jr., *Judge*) rejecting its claim that income realized from the repayment of a foreign currency loan after the currency has depreciated qualifies as "income by reason of the discharge of indebtedness." Under earlier

caselaw, the income in question would have been considered as resulting from such a discharge within the meaning of Section 108 of the Internal Revenue Code in effect for the relevant tax years. We agree with the Tax Court that the Supreme Court's decision in *United States v. Centennial Savings Bank FSB*, 499 U.S. 573, 111 S.Ct. 1512, 113 L.Ed.2d 608 (1991), undermined that caselaw. We therefore affirm.

## BACKGROUND

The facts are essentially undisputed. During the period 1980 through 1984, Philip Morris (taxpayer) borrowed and repaid foreign currency in six separate transactions. In four of these transactions, the taxpayer immediately converted the borrowed funds into U.S. dollars. The proceeds from the remaining two loans were used to purchase certain machinery abroad. In all of the transactions the foreign currency had declined in value against the U.S. dollar by the time of repayment. The taxpayer thus repaid all of the loans in foreign currency with a lower U.S. dollar value than the U.S. dollar value of the currency when borrowed.

The specific transactions were as follows. On November 24, 1980, the taxpayer borrowed 100 million Swiss francs (SF) from Union Bank of Switzerland (UBS), repayable with interest on December 1, 1987. The funds were converted into U.S. dollars on the date they were borrowed at a rate of US $1 per SF 1.72038, for a total of $58,126,693. On September 1, 1983, the taxpayer prepaid the loan principal plus accrued interest, taking advantage of an exchange rate of US $1 per SF 2.1875.[1] The dollar value of the principal payment was thus $45,714,286.[2]

On December 22, 1980, the taxpayer borrowed an additional SF 125 million from UBS, repayable with interest on December 31, 1985. The proceeds of this loan were also converted to U.S. dollars on the date of borrowing, at the rate of US $1 per SF 1.81308, for a total of $68,943,455. The taxpayer prepaid the principal and accrued interest and paid a prepayment penalty on May 31, 1983. On that date the exchange rate was US $1 per SF 2.1005.[3] The U.S. dollar value of the principal payment was therefore $59,509,641.

The final Swiss franc borrowing occurred on December 23, 1980. On that date, the taxpayer borrowed SF 75 million from Swiss Bank Corporation (SBC), to be repaid on December 23, 1985. The proceeds were converted on the same day to U.S. dollars at a rate of US $1 per SF 1.81310, for a total of $41,365,587. On January 7, 1983, the taxpayer prepaid the SF 75 million principal. The exchange rate on the date of repayment was US $1 per SF 1.9340,[4] giving the repayment a U.S. dollar value of approximately $38,779,-731.[5]

On December 1, 1981, the taxpayer financed, in pounds sterling, 80 percent of the contract value of certain manufacturing equipment to be purchased by the taxpayer, with the financed amount to be repaid in 10 equal semi-annual installments with interest. The exchange rate between the pound sterling and the U.S. dollar on the dates the machinery was shipped generated a dollar value for 20 percent of the financed amount (representing two semi-annual installments) of $256,592. The taxpayer made two semi-annual installment payments in 1983 and two in 1984, with total U.S. dollar values of $215,-633 and $188,410, respectively.

---

1. The taxpayer conceded in the Tax Court that the repayments of its Swiss franc borrowings had been calculated erroneously using the dollar cost of the Swiss francs used for repayment instead of their dollar value on the date of repayment. This error was reflected in its tax returns.

2. On this appeal, we consider the facts as stipulated by the parties and reflected in the Tax Court's decision. We have not independently verified the stipulated figures.

3. *See supra* note 1.

4. *See supra* note 1.

5. The Tax Court appears to have figured the repayment value using an exchange rate of U.S. $1 per SF 2.0150. That was the governing rate on December 22, 1982, when the taxpayer acquired the Swiss francs used for repayment. The taxpayer concedes that the dollar value at repayment is the appropriate measure. *See supra* note 1.

On September 2, 1982, the taxpayer entered into a similar transaction, again financing, in pounds sterling, 80 percent of the contract value of manufacturing equipment to be purchased by taxpayer, with the financed amount to be repaid in 10 equal semi-annual installments plus interest. On the date of shipment, 10 percent of the financed amount was equivalent to US $1,063,367. In 1983, the taxpayer made one semiannual installment payment in pounds sterling having a U.S. dollar value of $981,144, based on the exchange rate on the date of payment. In 1984, the taxpayer made two semi-annual installment payments in pounds sterling having a total U.S. dollar value of $1,759,735, also based on the exchange rate on the dates of payment.

Finally, on February 10, 1982, a wholly owned subsidiary of the taxpayer sold to a German bank, for ultimate sale to the public, 150 million German deutsche marks (DM) of 9½ percent seven-year bearer bonds, which were guaranteed by the taxpayer. The net proceeds of the bearer bond issue amounted to DM 147,888,333 after underwriting fees and other expenses. Those funds were transferred from the subsidiary to the taxpayer on a discount basis on February 16, 1982, and the taxpayer converted the marks into $62,581,611 on the same day at an exchange rate of US $1 per DM 2.36313. From March 12, 1984 through May 3, 1984, the subsidiary repurchased in the market bearer bonds with a total par value of DM 10 million, for a purchase price of DM 10,924,825 plus accrued interest. At the exchange rates prevailing on the dates of prepayments, the value of DM 10 million was $3,769,505.

The taxpayer treated the foreign exchange gain from each of these six transactions as income from "the discharge . . . of indebtedness" on its federal income tax returns. It elected to exclude those amounts from its gross income under I.R.C. § 108 and to reduce the basis of its depreciable assets under I.R.C. § 1017. The Commissioner disallowed the elections and determined deficiencies in

taxpayer's income tax for both years. After an unsuccessful petition in the Tax Court for a redetermination of the deficiencies, the taxpayer took the instant appeal.

## DISCUSSION

■■■ In the hands of a U.S. taxpayer, foreign currency is considered property. *See Federal Nat'l Mortgage Ass'n v. Commissioner,* 100 T.C. 541, 582, 1993 WL 210390 (1993). When engaging in a transaction in a foreign currency, therefore, a taxpayer ordinarily must translate the foreign currency into U.S. dollars for the purposes of calculating the U.S. tax consequences of the transaction. *See, e.g., Bernuth Lembcke Co. v. Commissioner,* 1 B.T.A. 1051, 1054, 1925 WL 896 (1925); Rev.Rul. 78-281, 1978-2 C.B. 204. One consequence of this rule is that a taxpayer may satisfy a foreign currency loan with the exact sum of foreign currency stipulated and yet realize a gain or loss when the foreign currency is translated into U.S. dollars. The question presented on this appeal is whether a gain from such borrowing and repayment in depreciated foreign currency is entitled to deferral under the pre-1986 Internal Revenue Code.[6]

During the tax years at issue, I.R.C. § 108 provided in pertinent part that

[g]ross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if . . .

(C) the indebtedness discharged is qualified business indebtedness.

The statutory definition of "qualified business indebtedness" includes "indebtedness . . . incurred or assumed . . . by a corporation," I.R.C. § 108(d)(4)(A), and we assume for the purposes of this appeal that the six loans at issue would so qualify. The core of this dispute is whether the taxpayer's repayments of foreign currency loans are "discharges" within the meaning of the statute,

6. The Tax Reform Act of 1986 provides that, for tax years beginning after December 31, 1986, foreign currency borrowings such as those involved in this case are governed by I.R.C. § 988, which treats foreign currency gain as ordinary income, I.R.C. § 988(a). *See also* Pub.L. No. 99-514, § 822(a), 100 Stat. 2373 (1986 amendment limiting Section 108 to situations in which the taxpayer is insolvent or in bankruptcy at the time of the discharge of indebtedness).

and, if they are, whether the foreign exchange gain produced is by reason of "the discharge of indebtedness."

Under the only court of appeals decision directly on point, the foreign exchange transactions in this case would each have been considered a discharge of indebtedness, and the income produced would have been "by reason of" that discharge. *See Kentucky & Indiana Terminal R.R. v. United States,* 330 F.2d 520, 523 (6th Cir.1964). In that case, the taxpayer sold bonds denominated in pounds sterling and, after the pound had been devalued, repurchased those bonds in a combination of dollars and pounds for less than face value. The differential between the face value of the bonds and the purchase price thus consisted of two elements: first, the portion attributable to the repurchase of bonds at less than face value and, second, the portion attributable to the decline in the value of the pound sterling. The government urged the Sixth Circuit to construe only the first of these elements as income from the discharge of indebtedness under I.R.C. § 22(b)(9), Section 108's predecessor. The court refused, holding that the taxpayer would not have realized any of the second type of gain "except for the discharge of the indebtedness incurred." 330 F.2d at 523.

The Sixth Circuit noted that Section 22(b)(9) was a congressional reaction to the Supreme Court's decision in *United States v. Kirby Lumber Co.,* 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931), which held that a taxpayer realized taxable income when it purchased some of its outstanding bonds at a discount from the issuing price. The court pointed out that Section 22(b)(9) responded to the possibility that, under *Kirby Lumber,* a corporation might realize a taxable gain without receiving cash in hand to pay the resultant tax. *Kentucky & Indiana,* 330 F.2d at 524. The court thus held that

> [t]o require the taxpayer in the instant case to include any part of the gain realized from the purchase of its outstanding bonds here involved as taxable income for the year when such bonds were acquired, would defeat the underlying purpose of Section 22(b)(9). Neither the language of this statute nor its legislative history indicate a Congressional intent to exclude from the benefits of the statute any of the income attributable to the discharge of taxpayer's indebtedness, for any reason whatsoever.

*Id.* The Commissioner does not dispute the taxpayer's assertion that, until *Centennial Savings Bank, Kentucky & Indiana* was generally accepted as governing law.[7]

However, we agree with the Commissioner and the Tax Court that the Supreme Court's decision in *Centennial Savings Bank,* while not expressly addressing foreign exchange transactions or the continued viability of *Kentucky & Indiana,* effectively undermined the latter decision. The issue in *Centennial Savings Bank* was whether a bank could treat funds received as penalties for customers' early withdrawal of certificates of deposit as "income by reason of the discharge ... of indebtedness" eligible for exclusion from gross income and reduction in basis. 499 U.S. at 575, 111 S.Ct. at 1514. The Supreme Court responded in the negative on the ground that the depositors who withdrew their deposits and paid the penalties did not discharge Centennial from any obligation of the debt. *Id.* at 579, 111 S.Ct. at 1516–17. The Court explained that "[a]s used in § 108, the term 'discharge ... of indebtedness' conveys *forgiveness of,* or *release from,* an obligation to repay." *Id.* at 580, 111 S.Ct. at 1517 (footnote omitted) (emphasis in original). To determine whether a release of an obligation has occurred, *Centennial Savings Bank* suggested scrutiny of both the end result of the transaction and the repayment terms agreed to at the outset of the lender-borrower relationship. *Id.* at 581, 111 S.Ct.

---

7. Other decisions have relied upon *Kentucky & Indiana* in holding that foreign exchange gains or losses associated with repaying an obligation in foreign currency are not long-term capital gains or losses, but rather are ordinary income or losses. *See National–Standard Co. v. Commissioner,* 749 F.2d 369, 372 (6th Cir.1984) (loss realized in paying an obligation in foreign currency as a result of a change in exchange rates is attributable to paying the debt); *Gillin v. United States,* 423 F.2d 309, 314, 191 Ct.Cl. 172 (1970) ("The [currency] conversions were not independent of, or separate from, the debt but were integral to the arrangement and formed a necessary part of it.... [T]here was an assumption and repayment of a debt for less than face value, resulting in ordinary gain....").

at 1517–18. Because, in Centennial's case, the prepayment penalty income was an original term of the certificate of deposit and not the result of the release of any legal obligation, the Supreme Court held that the prepayment penalty did not constitute income by reason of a discharge. *Id.*

In the instant case, the Tax Court held that the rationale of *Centennial Savings Bank* applied and that the taxpayer's gains from the foreign currency transactions were not the result of a discharge of indebtedness within the meaning of Section 108. *Philip Morris Inc. v. Commissioner,* 104 T.C. 61, 73, 1995 WL 23338 (1995). In the Tax Court's view, although a satisfaction of indebtedness in depreciated currency may be the occasion for the realization of income, the income is not realized "by reason of the discharge ... of indebtedness" under Section 108 unless there is a forgiveness or release of an obligation imposed in connection with the underlying debt. *Id.*

The taxpayer argues that the Supreme Court did not have foreign exchange transactions in mind when it decided *Centennial Savings Bank.* This may be true. Indeed, the Court's opinion appears predicated, in part, on a desire to avoid a tax windfall to those who are relieved of a debt in circumstances that generate current income. Here, in contrast, the taxpayer has taken advantage of favorable market conditions to eliminate preexisting debt by a payment that fulfills the terms of the original debt but is functionally less than that debt. Unlike *Centennial Savings Bank,* the facts of this case are similar to those presented in *Kirby Lumber.* It therefore appears to be just the type of situation that Congress sought to ameliorate by "establish[ing] the tax-deferral mechanism in § 108 so that the prospect of immediate tax liability would not discourage businesses from taking advantage of opportunities to repurchase or liquidate their debts at less than face value." *Centennial Savings Bank,* 499 U.S. at 582–83, 111 S.Ct. at 1518 (citations omitted). The legislative history of Sections 22(b)(9) and 113(b)(3), the progenitors of Sections 108 and 1017, provides some support for this argument. *See* S.Rep. No. 1631, 77th Cong., 2d Sess. 77 (1942). Nevertheless, we are not at liberty to entertain the taxpayer's position in light of the Supreme Court's clear holding in *Centennial Savings Bank* that Section 108(a) requires a forgiveness or release of an obligation of the underlying debt to constitute the requisite discharge of indebtedness. 499 U.S. at 583, 111 S.Ct. at 1518–19.

One final matter remains. The taxpayer argues that if, as we have determined, the rationale of *Centennial Savings Bank* governs the disposition of this case, four of the transactions—the three Swiss franc loans and the German mark loan—fall within the requirements of *Centennial Savings Bank* because the taxpayer took affirmative action to prepay those borrowings. We disagree. In each case, the prepayment represented the fulfillment of the original obligation to repay the amount borrowed. While the repayment may have been accelerated and may have entailed negotiation over the prepayment fee and other ancillary matters, the foreign exchange gains here resulted not from the forgiveness of an obligation to pay but from the performance of that obligation. They thus fall outside the scope of Section 108 as interpreted by *Centennial Savings Bank.*

We therefore affirm.