DECISION
Plaintiffs appeal Defendant's Notices of Deficiency Assessment for tax years 2003 and 2004. A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on January 15, 2008. Gerald J. Moro, Certified Public Accountant, appeared on behalf of Plaintiffs. The following individuals testified on behalf of Plaintiffs: Donald R. Daggett (Daggett), Senior Vice President, Banner Bank; Jesse G. Foster (Foster), Vice Chairman of the Board of Directors, Banner Bank; E. George Koffler (Koffler), President, Bank of Eastern Oregon; Dennis B. Logan (Logan); John Lloyd (Plaintiff); and J. David Murdock (Murdock). Glenda Wesley (Wesley), Senior Tax Auditor, Oregon Department of Revenue, appeared on behalf of Defendant. *Page 2 
Plaintiffs' Exhibits 1 through 14 were received without objection. Defendant's Exhibits A and B were received without objection.
Prior to trial, the parties stipulated that the only remaining issue before the court is the characterization of Plaintiffs' various payments made to Bank of Eastern Oregon and Banner Bank. (See Ptfs' Ex 4.) The parties agree that Plaintiffs' net operating loss deduction for tax year 2003 is increased in the amount of $56,450. (Id.)
Plaintiffs' post-trial memorandum was filed January 31, 2008. Defendant's post-trial memorandum was filed February 13, 2008. This matter is now ready for decision.
 I. STATEMENT OF FACTS
Plaintiffs acquired a 25 percent interest in a corporation, Western Alfalfa, Inc., in 1998. (See Ptfs' Exs 7-1, 9-9.) At the time of the acquisition, Western Alfalfa, Inc. obtained a loan from Inland Empire, which is now known as Banner Bank. (Ptfs' Ex 7-1.) Daggett and Logan testified that the amount of the loan was personally guaranteed by Plaintiffs and each of the other shareholders (Murdock and Logan).
In 1999, Plaintiffs signed a promissory note, borrowing $753,865 from Bank of Eastern Oregon. (Ptfs' Exs 9-7, 9-8.) The promissory note was secured by "a Mortgage dated December 9, 1999, to Lender on real property located in MORROW County, State of Oregon[.]" (Id.) Koffler testified that the Bank of Eastern Oregon's collateral was a second mortgage on the Western Alfalfa, Inc. plant. He testified that within three months the security interest was released because it was in violation of the corporation's agreement with the original mortgage holder. Koffler testified that the collateral for the loan was 300 common shares of Western Alfalfa, Inc. stock and a personal guarantee from Logan. He stated that the bank recorded its interest in the stock by "making a UCC filing." *Page 3 
In December, 2002, the terms of the loan changed. (Ptfs' Ex 9-9; Def's Ex A-3-3.) The interest rate was reduced from 9.5 percent to 6.0 percent, and the interest rate was to be readjusted on December 15, 2007, to prime plus 1.25 percent until the loan was fully paid on December 15, 2012. (Id.) The loan continued to be "secured" by 300 shares of Western Alfalfa, Inc. common stock. (Id.) The "Change in Terms Agreement" (Agreement) stated that "Borrower [Plaintiff] further understands and agrees to transfer all 75 shares of Western Alfalfa, Inc. common stock, registered to John D. Lloyd, to Dennis B. Logan when subject loan is paid in full." (Id.) After that sentence the following handwritten statement was initialed by John Lloyd: "[Barrower (sic) again agrees only to transfer stock equal to the percentage of the balance that is paid by other parties." (Id.) The Agreement stated that Plaintiffs "are not required to provide the Bank of Eastern Oregon with a lien on personally owned real estate or assign their interest in any business holdins (sic) other than Western Alfalfa, Inc. to the bank. However the borrower's (sic) understand and agree that such assets may not be mortgaged, assigned or transfered (sic) for any purpose other than for the obtaining of operating capital for their personal farming operation. If such assets are sold, the borrowers agree to apply the proceeds from such a sale to the subject loan." (Id.)
Plaintiff testified that soon after the Bank of Eastern Oregon loan terms were renegotiated he contacted the officers of Banner Bank and Bank of Eastern Oregon. He testified that Western Alfalfa, Inc."continued to lose money" and he "desired to be away from that situation." Plaintiff provided both banks with financial statements that stated his liabilities exceeded his assets. He testified that he wanted to avoid bankruptcy. Plaintiff offered to sell a rental property and some equipment he owned, giving the proceeds from those sales to the banks to "relieve" him of the debt. *Page 4 
After lengthy discussions, Banner Bank agreed to remove Plaintiffs as a personal guarantor of the Western Alfalfa, Inc. loan. On December 5, 2003, Plaintiff wrote a personal check to the Bank of Eastern Oregon for a cashier's check that was made payable in the amount of $100,000 to Western Alfalfa, Inc. (Def's Ex A-6-6.) That same day, Banner Bank Vice President Jeffrey R. Davis wrote a letter stating that Banner Bank released Plaintiffs from their guarantor obligations "in consideration of * * * payment to our loans of $100,000 * * * [and] transfer of your ownership and/or voting rights of all Western Alfalfa, Inc. stock to Dennis Logan effective with this agreement." (Def's Ex A-8.) The letter stated that "the proposal" to release Plaintiffs "from your guarantee of all debt owed to Banner Bank by Western Alfalfa, Inc." was "made to us by Mr. Logan[.]" (Id.) The letter conflicts with the testimony of the witnesses, Plaintiff, Daggett and Foster, who stated that Plaintiff personally approached the bank and negotiated a settlement based on consideration of Plaintiffs' financial inability to continue as guarantor. Logan testified that, at the time Plaintiff negotiated the release from Banner Bank, the loan "was not current; it was in default." Logan testified that he continued as a guarantor because he "had more assets than the others."
Plaintiff approached the Bank of Eastern Oregon seeking, in his terms, to arrange a "deal to avoid bankruptcy." Plaintiffs and Koppler signed an agreement on August 15, 2003, stating that "with the payment of $175,000 to the Bank of Eastern Oregon, credited to debts guaranteed by Western Alfalfa, that John and Cathy Lloyd are released from any and all liability for repayment of their stockholder debt to Bank of Eastern Oregon, loan number 30540645 in the original amount of $753,865." (Ptfs' Ex 10.) Plaintiffs, and Western Alfalfa, Inc. on behalf of Plaintiffs, made the following payments to the bank: *Page 5 

 Date Amount
 August 18, 2003 $ 43,755.36
 September 15, 2003 $ 10,940.00
 December 5, 2003 $ 21,880.00
 December 20, 2003 $102,000.00
 January 14, 2004 $ 21,424.64
 Total $200,000.00

(Ptfs' Ex 11-1.) Those payments were evenly credited to Plaintiffs' loan and a loan held by another Western Alfalfa, Inc. shareholder, Murdock. (Def's Exs A-12-1, A-12-2.) On February 23, 2004, the outstanding balance of Plaintiffs' loan was $565,940.71. (Def's Ex A-12-1.) Koffler testified that the Bank of Eastern Oregon agreed to transfer the balance of Plaintiffs' loan to Logan, who had personally guaranteed Plaintiffs' loan. Under the terms of the Assumption Agreement, Release and Novation, dated March 31, 2004, Plaintiffs transferred their ownership of 75 shares of Western Alfalfa, Inc. stock to Logan, who then assigned his rights to the Bank of Eastern Oregon "as security for the assumption of [Plaintiffs' loan obligation]." (Def's Exs A-2-1 to 3; see Def's Ex A-3-3.) Plaintiff testified that he did not have a "plan" to sell his ownership interest in Western Alfalfa, Inc. Plaintiff testified that "he went to the banks to work out the debt and avoid bankruptcy."
Defendant challenges Plaintiffs' characterization of the payments as debt forgiveness. Defendant alleges that the payments were a series of steps that resulted in Plaintiffs' sale of their Western Alfalfa, Inc. stock. (Def's Ex A-7-1.) Defendant concluded that Logan's assumption of the balance of Plaintiffs' outstanding Bank of Eastern Oregon loan in the amount of $565.940.71 was proceeds from the sale of stock. (Id.) Defendant reduced the proceeds by the total amount of payments ($300,000) to both banks, Bank of Eastern Oregon and Banner Bank. (Id.) Defendant concluded that the gain on the stock sale to be reported in tax year 2004 was $265,941. (Id.) Plaintiffs timely appealed Defendant's determination. *Page 6 
 II. ANALYSIS
Oregon has adopted the federal income tax law as a starting point for determining the personal taxable income of its residents. ORS316.048.[1] In analyzing the law governing state taxable income, the court is guided by the legislature's express intent to "[m]ake the Oregon personal income tax law identical in effect to the provisions of the Internal Revenue Code relating to the measurement of taxable income of individuals[.]" ORS 316.007. Specifically, the legislature intended the Internal Revenue Code (IRC) provisions relating to "the definition of income, exceptions and exclusions therefrom, deductions * * * [and] depreciation * * *" to be applied. ORS 316.007 (2).
IRC section 162(a)[2] "allows a deduction for ordinary and necessary business expenses paid or incurred during the taxable year in connection with the carrying on of a trade or business." Winter v. Comm'r, TC Memo 2002-173, WL 1752216 at *3 (2002), citing Comm'r v. Lincoln Sav. LoanAss'n, 403 US 345, 352, 91 S Ct 1893, 29 L Ed 2d 519 (1971). Plaintiffs claim that their payments to the banks should be deductible as "ordinary and necessary [business] expenses * * *." IRC § 162(a).
A. Bank of Eastern Oregon Loan
Plaintiffs' loan obligation to Bank of Eastern Oregon was a loan taken in their names; it was a bona fide debt as defined by the Treasury Regulations. "A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Treas Reg § 1.166-1(c) (as amended in 1986). There is no dispute that the proceeds of the loan were used for Western Alfalfa, Inc. business expenses. *Page 7 
Plaintiffs obtained the original recourse loan in the amount of $753,865 in December 1999. (Ptfs' Ex 9-7.) The terms of the loan were renegotiated in December 2002, when the loan balance was $620,429.15. (Ptfs' Ex 9-9.) Over the next 13 months, payments were credited to this loan. On March 31, 2004, Logan "assumed" Plaintiffs' outstanding loan balance in the amount of $565,940.71, including "all the terms and conditions." (Ptfs' Exs 9-1 to 9-3.) Logan's assumption of Plaintiffs' loan was in consideration of Plaintiffs' transfer of their 75 shares in Western Alfalfa, Inc. to the Bank of Eastern Oregon "as security for the assumption of the obligations * * *." (Id. at 9-2.)
There are three issues before the court related to this loan: (1) cancellation of debt income to Plaintiffs; (2) transfer of Plaintiffs' stock in Western Alfalfa, Inc. to the majority shareholder, Logan; and (3) Plaintiffs' stock basis resulting from any indebtedness of Western Alfalfa, Inc.
B. Cancellation of Debt Income
Cancellation of a debt owed by a taxpayer is generally income to that taxpayer. See United States v. Kirby Lumber Co., 284 US 1, 52 S Ct 4,76 L Ed 131 (1931) (holding that the gain or saving that is realized by a debtor by the reduction or cancellation of its outstanding debt obligation for an amount less than the total amount due is income to the taxpayer). The Supreme Court held that discharge of indebtedness income is only realized when "a creditor agrees to release a debtor from a [repayment] obligation assumed at the outset of the [debtor-creditor] relationship." United States v. Centennial Sav. Bank FSB, 499 US 573,583, 111 S Ct 1512, 1514, 113 L Ed 2d 608 (1991) (Centennial). The rationale for the inclusion in income is the increase in wealth to a taxpayer who no longer is burdened by the debt obligation, or in other terms, because an economic benefit flows to the taxpayer. *Page 8 
The issue is whether Plaintiffs' obligation to the Bank of Eastern Oregon was discharged. Discharge occurs from an identifiable event triggering an outcome that ensures or assumes the debt will never be paid by the debtor. The event could be a settlement between the debtor and creditor, or the debtor's cancellation or write-off of the debt. Defendant quotes the following holding, from the U. S. Tax Court inSlavin v. Commissioner, which emphasizes that discharge results from the relationship between the taxpayer (debtor) and creditor:
 "[A] taxpayer has been forgiven or released from a debt when the facts reasonably establish that the debt will probably never be paid, that the taxpayer does not intend to repay the loan, and that the party who loaned the money does not intend to enforce its claim against the taxpayer."
(Def's Ex B-1-2, quoting Slavin v. Comm'r, TC Memo 1989-221, WL 46902 (1989) (Slavin) (emphasis added).
In the case before the court, Plaintiffs are no longer required to pay approximately $565,941 to Eastern Bank of Oregon. Defendant alleges that there was no cancellation of debt because Logan assumed Plaintiffs' loan obligation to the bank as part of Plaintiffs' transfer of stock. Defendant relies on Slavin, which holds that Slavin and his partner entered into Assignment and Indemnification Agreements resulting in Slavin selling his partnership interests and being "released from all liabilities and obligations related to the partnerships," including bank loans. Slavin, TC Memo 1989-221. In Slavin, the bank was not a party to any of the partners' agreements. (Id.) The U.S. Tax Court clearly stated that Slavin's partner "was not the lender and so he was incapable of forgiving petitioner's [Slavin's] debt to the bank." (Id.) In contrast, the Bank of Eastern Oregon was a party to the Release and Novation Agreement, which stated that the "Bank releases Borrowers [Plaintiffs] from all claims for any liability that has arisen or may have arisen with respect to the performance and indebtedness of the promissory notes, associated security agreements, and other associated obligations * * *." (Def's Ex A-2-3.) *Page 9 
Defendant emphasized the following provision in the Release and Novation Agreement to support its conclusion that there was no cancellation of debt: "The Bank accepts the liability of Logan in lieu of the liability of the Borrowers [Plaintiffs] * * *." (Id.) Defendant was mislead by the term "novation." A novation is a transaction which results in a debtor continuing to owe a creditor but not necessarily the same creditor. For example, A owes B $100 and B owes C $100. A, B, and C agree that A will now owe C (instead of B) $100, and B will no longer owe C $100. In this case, prior to signing the Release and Novation Agreement, Plaintiffs were debtors of the Bank of Eastern Oregon. Logan was a guarantor of Plaintiffs' debt obligation, but was not a debtor of the Bank of Eastern Oregon. There was no evidence that Plaintiffs were debtors of Lloyd, or visa versa. There was one and only one debtor/creditor relationship: Plaintiffs and the Bank of Eastern Oregon. After all parties signed the Release and Novation Agreement, Plaintiffs were no longer debtors of the Bank of Eastern Oregon. Even though the Bank of Eastern Oregon termed the agreement a novation, the transaction was not a novation.
Discharge within the context of IRC section 108 "can occur only if the creditor cancels or forgives a repayment obligation," and "the debtor is no longer legally required to satisfy his debt either in part or in full." Centennial, 449 US at 581, n 6 (emphasis added). There is no statutory requirement that the creditor cancel or write off the debt. In this case, Plaintiffs' repayment obligation was forgiven. The Bank of Eastern Oregon no longer looked to Plaintiffs to satisfy the debt obligation. A debtor/creditor relationship no longer exists between them. *Page 10 
The fact that the Bank of Eastern Oregon and Logan have created a debtor/creditor relationship does not negate the fact that Plaintiffs are "no longer legally required to satisfy" their debt obligation.Id. Plaintiffs have cancellation of debt income.[3]
There is a statutory exception to the general rule that cancellation of a debt is income for a taxpayer who is insolvent. IRC § 108(a)(1)(B). Insolvent for purposes of IRC section 108 "means the excess of liabilities over the fair market value of assets." IRC § 108(d)(3). Plaintiff testified that, to avoid bankruptcy, he approached each of the two lenders, Bank of Eastern Oregon and Banner Bank, to find a way to remove him from his debt obligations. Plaintiffs' witnesses, bank loan officers Daggett and Koffler, testified that after reviewing Plaintiffs' financial statements they concluded Plaintiffs were insolvent. The loan officers negotiated amounts in settlement of Plaintiffs' obligations; those amounts were substantially less than the full amount of the outstanding debt.
In analyzing whether Plaintiffs were insolvent, the court was not provided with copies of Plaintiffs' financial statements; it must therefore look at the testimony of Plaintiff and the bank loan officers. The bank loan officers, each with more than 25 years of banking experience at the time Plaintiff entered into loan "workout" discussions with them, were credible and knowledgeable. Based on the evidence, the court concludes that Plaintiffs were insolvent at the time of the cancellation of debt.
A taxpayer who is permitted to exclude cancellation of debt income because of insolvency must offset the exclusion against favorable tax attributes such as net operating losses, including *Page 11 
carryovers. IRC §§ 108(a)(1)(B), (b)(2)(A). The court was presented with information stating that the parties agree that Plaintiffs' net operating loss deduction for tax year 2003 is increased in the amount of $56,450. (Ptfs' Ex 4.) With respect to tax year 2004, the year of the cancellation of indebtedness, the court was not presented with any evidence of a net operating loss or carryover. Given the court's ruling, the parties should review the applicability of the offset discussed above.
C. Transfer of Plaintiffs' Stock
Defendant concludes that Plaintiffs' payments in the amount of $300,000 to Banner Bank and Bank of Eastern Oregon were "part of thestock sale agreement. The step doctrine deems this as one transaction in aggregate." (Def's Ex A-7-1) (emphasis in original).
Plaintiffs agreed to transfer the ownership of their stock in Western Alfalfa, Inc. to Logan. The terms of the transfer were memorialized in December 2002 as part of the renegotiation of the Bank of Eastern Oregon loan. (Ptfs' Ex 9-9.) Plaintiffs agreed to transfer their 75 shares of stock in Western Alfalfa, Inc. to Logan when the loan was paid in full. (Id.) The consideration for their promise was a reduction in the interest rate and an extension of the due date of the loan. (Id.) According to the terms of the agreement, the full amount of the consideration for their transfer could only be determined at the time the loan was satisfied or paid in full. (Id.)
On March 31, 2004, Plaintiffs' debt obligation was discharged and the promised stock transfer made. (See Ptfs' Ex 9-1 to 9-6.) Plaintiffs made loan payments from March 17, 2003, through December 31, 2003. (Def's Ex A-12-1.) The Loan Amortization schedule shows that the total amount of interest paid by Plaintiffs was $30,052.16. (Id.) If the interest rate had not been reduced from 9.5 percent to 6.0 percent, Plaintiffs would have paid $47,582.58 in interest. See Appendix A, Loan Interest. The difference between the two amounts is an interest rate reduction or savings in the amount of $17,530.42. Id. That amount must be doubled because Plaintiffs' *Page 12 
payments were credited to two loans: the loan in their name and the loan issued to Murdock. (See Def's Exs A-12-1, and A-12-2.) The consideration paid to Plaintiffs for the transfer of their stock came in the form of an interest rate reduction which totaled $35,060.84.[4]
In addition, Plaintiffs made at least one other payment on the loan because the principal balance on the date of the renegotiation was $648,082.49, whereas on March 17, 2003, it was $641,317.97. (Def's Exs A-3-3, and A-12-1.) The date of the payment or payments is unknown because no evidence was submitted to the court. If there was only one payment and it was not made until March 17, 2003, interest at the two rates would be as follows: 9.5 percent: $15,349.79; and 6.0 percent: $ 9,694.60. The net saving is $5,655.19, which must be doubled ($11,310.38).
Plaintiffs received consideration for their agreement to transfer their shares of common stock in Western Alfalfa, Inc. The amount of that consideration in the form of an interest rate reduction was no more than $46,371.22.[5] The parties are encouraged to confirm the loan payment dates and amounts paid on Plaintiffs' loan and the Murdock loan for the period of December, 2002 through March 17, 2003, and to compute the interest savings in the manner described above. That amount should be added to $35,060.84 to compute the total sale price of Plaintiffs' stock.
Defendant concludes that the stock transfer was in exchange for the guarantee release negotiated with Banner Bank and settlement of the Bank of Eastern Oregon debt obligation. In addition to reported conversations and documents, Defendant relies on a letter dated December 5, 2003, from Jeffrey R. Davis (Davis), Vice President, Banner Bank. (Def's Ex A-8.) The Davis letter stated that Plaintiffs would be released from their debt obligation in exchange for making a *Page 13 
$100,000 payment, transferring their "ownership and/or voting rights of all Western Alfalfa, Inc. stock to Dennis Logan effective with this agreement[,]" and signing the letter. (Id.) The letter was signed by Cathy Lloyd and the $100,000 payment was made December 5, 2003. (Id.) Plaintiffs' "ownership and/or voting rights of all Western Alfalfa, Inc. stock" were not transferred as of that date to Logan.
The sale of Plaintiffs' stock was not, as characterized by Defendant, a step transaction. The Davis letter did not require Plaintiffs to do anything that they had not previously agreed to do as of December, 2002. Further, the Davis letter may not be a legally enforceable agreement because, among other items of concern, Plaintiffs' stock was collateral for their personal loan with the Bank of Eastern Oregon. Koffler testified that the bank "made a UCC filing" listing the bank's collateral interest in Plaintiffs' stock. Without the consent of the Bank of Eastern Oregon, which was not given until March 31, 2004, Plaintiffs' stock could not be transferred. (See Ptfs' Exs 9-1 to 9-6.) When the stock was transferred, Plaintiffs' agreement made in 2002 as part of the renegotiated terms of the Bank of Eastern Oregon loan was fulfilled and the stock sale completed. (See Ptfs' Ex 9-9.)
D. Basis
A shareholder's basis in an S corporation is the total of capital contributions, "items of income," and corporate losses and deductions. IRC §§ 1367(a)(1), (2). A shareholder's ability to deduct corporate losses is limited "to the extent of his adjusted basis in his stock of the S corporation, sec. 1366(d)(1)(A), and `the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder', sec. 1366(d)(1)(B)." Miller v. Comm'r, TC Memo, 2006-125, WL 1652681 (2006) (Miller). *Page 14 
If the corporate losses exceed the basis, "the excess is `suspended' [indefinitely] until the shareholder's basis becomes large enough to permit the deduction."
Gitlitz v. Comm'r, 531 US 206, 210, 121 S Ct 701, 148 L Ed 2d 613
(2001).
To acquire basis with respect to indebtedness, "a shareholder must make an actual economic outlay[,]" specifically, the shareholder must be "`poorer in a material sense,'" and "the S corporation's indebtedness must run directly to the shareholder[.]" Miller, TC Memo 2006-125, (citations omitted.) A shareholder's loan to an S corporation, including a loan funded with money obtained from a third-party lender, adds to the basis of that shareholder. Id. (citing IRC § 1366(d)(1)(B); Bolding v.Comm'r, 117 F 3d 270 (5th Cir 1997) (rev'g TC Memo 1995-326) (additional citations omitted). Discharge of debt cancellation income that is excluded under IRC section 108(a) cannot be taken into account to increase a stockholder's basis under IRC section 1366(a). See IRC § 108(d)(7)(A) (Supp II 2000). Further, a stockholder's agreement to guarantee a loan of the corporation does not give "rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the existing obligation."Miller, TC Memo 2006-125 (citing Raynor v. Comm'r, 50 TC 762, 770-71, WL 1515(1968)).
For the tax years at issue, Plaintiffs were shareholders in Western Alfalfa, Inc., an S corporation. Plaintiffs purchased 75 shares (a 25 percent ownership interest) of stock, paying $500,000. (See Ptfs' Ex 14-1.) Plaintiffs transferred their interest in Western Alfalfa, Inc. on March 31, 2004. (See Ptfs' Exs 9-1 to 9-6.) There is a gain or loss from disposition of Plaintiffs' stock that must be computed.
In computing that gain or loss, the starting point is Plaintiffs' capital contribution. The applicable laws require that Plaintiffs' basis be increased for corporate income and reduced for corporate losses.See IRC § 1367(a); IRC § 108. Plaintiffs' indebtedness to the Bank of Eastern *Page 15 
Oregon to fund the operations of Western Alfalfa, Inc. must be analyzed for inclusion in the basis of Plaintiffs' stock. Plaintiffs' cancellation of debt income does not increase Plaintiffs' stock basis. Plaintiffs' agreement to guarantee Western Alfalfa, Inc.'s loan from Banner Bank, and their subsequent payment to release them from their guarantee, which is discussed below, do not increase Plaintiffs' stock basis.
The court lacks sufficient information to compute Plaintiffs' stock basis and the resulting gain or loss arising from the stock transfer. The parties are encouraged to review the applicable law set forth in the court's Decision and compute Plaintiffs' gain or loss.
E. Western Alfalfa, Inc. Receivable from Plaintiffs
Wesley's audit determined that Plaintiffs owed Western Alfalfa, Inc. $134,381. (Ptfs' Ex 1-6.) In her audit report, Wesley offered the following explanation of the debt:
 "The loans from Bank of Eastern Oregon that were in your name [Plaintiffs] were being paid by Western Alfalfa instead of you personally. This became an accounts receivable for Western Alfalfa because you owed Western Alfalfa for these payments they made on your bank loan. This receivable went away and you no longer owed Western Alfalfa for this money after the stock sale."
(Id.) When computing the gain on sale of stock, Wesley concluded that "[t]he sales price is * * * the debt to Western Alfalfa * * *" in the amount of $134,381. (Id.) At trial, this proposed adjustment was not discussed.
Absent evidence to the contrary, and there was none, the court's discussion of cancellation of debt income is applicable to Western Alfalfa, Inc.'s cancellation of Plaintiffs' "accounts receivable." Western Alfalfa, Inc.'s cancellation of Plaintiffs' "accounts receivable" occurred at the same time as the cancellation of debt by the Bank of Eastern Oregon. *Page 16 
Based on the evidence, the court concludes that Plaintiffs were insolvent at the time of the cancellation of debt to Bank of Eastern Oregon. Defendant's proposed audit adjustment to include the cancellation of Western Alfalfa, Inc.'s "accounts receivable" as the receipt of sale proceeds by Plaintiffs is denied.
F. Banner Bank
Plaintiffs personally guaranteed Western Alfalfa, Inc.'s loan obligation to Banner Bank. Payments made by a guarantor in discharge of part or all of its obligation as a guarantor are allowed as a bad debt deduction under Treasury Regulation section 1.166-9 (as amended in 1983). Section 1.166-9(a) provides that a payment made in discharge of part or all of a taxpayer's obligation as a guarantor is treated as a business debt becoming worthless in the taxable year in which the payment is made or, where the agreement provides for a right of subrogation against the issuer, in the taxable year in which the subrogation right becomes totally worthless.[6] Treas Reg §§ 1.166-9(a), (e)(2). A payment is treated as worthless debt only if the following three requirements are met:
 (1) the agreement was entered into in the course of the taxpayer's trade or business or a transaction for profit;
 (2) there was an enforceable legal duty upon the taxpayer to make the payment (except that legal action need not have been brought against the taxpayer); and
 (3) the agreement was entered into before the obligation became worthless.
Treas Reg § 1.166-9(d).
In this case, the evidence presented shows that Plaintiffs' guarantee was made in the course of their trade or business. (Id.) The loan proceeds were put into the operation of Western Alfalfa, Inc. At the time Plaintiffs made their payment, the loan was in default but Banner Bank *Page 17 
had not brought a legal action against them. (Id.) Plaintiffs' agreement to make the payment was entered into before the obligation became worthless. (Id.)
Even though the loan was in default at the time Plaintiffs negotiated their release, Plaintiffs were the only one of the three guarantors released. The letter dated December 5, 2003, from Banner Bank, states that Plaintiffs were being released from their "guarantee." (Def's Ex A-8.) Because Plaintiffs were the only guarantors released, the court finds that it is more accurate to characterize Plaintiffs' payment as a release from their guarantee obligations rather than a discharge of part or all of their obligation as a guarantor. Such payments are generally deductible by a guarantor as an ordinary business loss. See Shea v.Comm'r, 36 TC 577, WL 1162 (1961), aff'd, 327 F 2d 1002 (5th Cir 1964) (Shea) (holding that a shareholder's payment for release of guarantee was an ordinary loss under IRC § 165(c)(2)); Rushing v. Comm'r,58 TC 996, 1001, WL 2529 (1972) (holding "that certain payments which had their genesis in petitioners' status as guarantors were payments which resulted in losses incurred in a transaction entered into for profit, deductible under section 165(c)(2)"(citing Shea, 36 TC 577, among others)). Plaintiffs knew that the Banner Bank loan was in default and they were in a position to be primarily liable on the guarantee. To ensure that they were not primarily liable, Plaintiffs' negotiated a release from their guarantee.
 III. CONCLUSION
After careful review of the testimony and evidence, the court concludes that at the time Plaintiffs were discharged of their debt obligation to Bank of Eastern Oregon they were insolvent. Absent evidence to the contrary, the court concludes that at the time Plaintiffs were discharged of their debt obligation to Western Alfalfa, Inc. they were insolvent. The discharge of indebtedness requires that net operating losses, if any, be offset. The parties are advised to *Page 18 
review the applicability of the offset rule to Plaintiffs. Plaintiffs negotiated the transfer of their common stock in Western Alfalfa, Inc. in December 2002. In return for agreeing to transfer their stock to Western Alfalfa, Inc.'s majority shareholder, Logan, the interest rate on their debt obligation was reduced from 9.5 percent to 6.0 percent. The interest rate reduction was the amount received by Plaintiffs in exchange for the promise to transfer their stock. The gain or loss on the transfer of Plaintiffs' stock is unknown because the court lacks sufficient information to compute Plaintiffs' stock basis. The parties are encouraged to review the applicable law set forth in the court's Decision and compute Plaintiffs' stock basis and gain or loss on stock sale. Plaintiffs' $100,000 payment to Banner Bank was to secure their release from their guarantee of Western Alfalfa Inc.'s debt obligation. Now, therefore,
IT IS THE DECISION OF THIS COURT that in 2004, Plaintiffs' discharge of their debt obligation to Bank of Eastern Oregon in the amount of $565,940.71, and to Western Alfalfa, Inc. in the amount of $134,381 was income. At the time of the discharge of their debt obligations Plaintiffs were insolvent. Plaintiffs' net operating loss and net operating loss carryovers, if any, must be offset by the exclusion of income.
IT IS FURTHER DECIDED that Plaintiffs' net operating loss for tax year 2003 is increased per the agreement of the parties in the amount of $56,450.
IT IS FURTHER DECIDED that under the terms of an agreement dated December 16, 2002, Plaintiffs transferred their 75 shares of common stock in Western Alfalfa, Inc. on March 31, 2004. Based on the evidence presented to the court, Plaintiffs received no more than $46,371.22 for their transfer. The parties will confirm the exact amount of the sale proceeds after reviewing the court's Decision. *Page 19 
IT IS FURTHER DECIDED that Plaintiffs' basis in the Western Alfalfa, Inc. stock must be computed after reviewing the applicable law cited in the court's Decision; and
IT IS FURTHER DECIDED that Plaintiffs' payment in the amount of $100,000 was to secure their release as a guarantor of Western Alfalfa, Inc.'s loan from Banner Bank and is deductible as an ordinary business loss under IRC section 165(c)(1).
Dated this _____ day of May 2008.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanner on May8, 2008. The Court filed and entered this document on May 8, 2008. *Page 20 
 Appendix A Loan Interest
 Principal Days Interest Rate Interest Rate
 Balance* Outstanding* 9.5 Percent 6.0 Percent*
 $641,317.97 38 $ 6,342.90 $ 4,006.04
 639,854.59 117 19,484.89 12,306.25
 630,283.16 27 4,429.25 2,797.42
 627,611.16 46 7,514.14 4,745.77
 626,887.51 24 3,915.90 2,473.20
 623,891.29 28 4,546.71 2,871.61
 575,801.16 9 1, 348.79 851.87
 Total $47 $30,052.16
 Interest Rate Difference $17,530.42

* Source: Def's Exs A-12-1 and-12-2.
Note: Reported payments in the amount of $200,000 (Def's Ex A-6-2) and payments credited to loan amortization ($199,921.16) (Defs' Ex A-12-1 to A-12-2) differ by the late charges ($78.84) which did not reduce the principal loan balance.
[1] All references to the Oregon Revised Statutes (ORS) are to 2003 unless otherwise stated.
[2] All references to the Internal Revenue Code (IRC) are to 2000 unless otherwise stated.
[3] Defendant stated that if the Bank of Eastern Oregon had forgiven Plaintiffs' debt it would have issued a Form 1099C, "notifying him of cancellation of debt income." (Def's Closing Brief at 3.) The court does not find the Bank of Eastern Oregon's failure to issue a Form 1099C more persuasive than the stated terms of the signed agreement and testimony of the bank officers. Failure to file the Form 1099C could have been the result of an oversight or lack of knowledge.
[4] $17,530.42 x 2 = $35,060.84
[5] $35,060.84 + (2 x $5,655.19 =$11,310.38) = $46,371.22.
[6] The court was not presented with a document memorializing the terms of the guarantee agreement. *Page 1